# EXHIBIT 21

## PHARMACY NETWORK AGREEMENT

This Pharmacy Network Agreement ("Agreement"), effective as of the noted date set forth by Administrator on the signature page hereto (the "Effective Date") is made and entered into by and between OptumRx, Inc., a California corporation, ("Administrator"), and AmerisourceBergen Drug Corporation dba Good Neighbor Pharmacy Provider Network ("Company"), a pharmacy service administrative organization, or PSAO, as the authorized contracting agent for and  on behalf of those participating pharmacies which are members in Company's network of pharmacies (each, a "Pharmacy"). Administrator, Company and Pharmacies may be referred to in this Agreement individually as a "party" and collectively as "parties."

## RECITALS

A.      Administrator has entered or in the future will enter into written agreements with Clients for certain consultative, administrative, network, and/or claims processing services in connection with the operation of that Client's Benefit Plan.

B.      Pharmacy operates one or more pharmacies that are duly licensed and qualified to provide Covered Prescription Services to Members of Clients.

C.      Pharmacy seeks to provide Covered Prescription Services to Members of Clients using its Pharmacies in accordance with the terms and conditions of this Agreement.

D.      Company has the authority to enter into this Agreement as the contracting agent for and on behalf of Pharmacy.

NOW THEREFORE, in consideration of the foregoing premises, mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, agree as follows:

1.      Defined Terms. All capitalized terms contained in this Agreement will have the meanings as set forth herein or as defined in an addendum or exhibit to this Agreement.

   1.1     "Proprietary Information" shall mean: (i) as to Administrator as Disclosing Party (as defined in Section 8.2 of this Agreement), this Agreement and all documentation now and hereafter related to the performance of this Agreement, including, without limitation, the Formulary and MAC list; (ii) each party's methods of doing business, including utilization review and quality assurance procedures and programs; (iii) any and all of a party's symbols, trademarks, trade names, service marks and other Marks, patents, inventions, copyrights, copyrightable material, trade secrets, personnel information, operating manuals, memoranda, work papers, notes, reports, customer or Client lists, business information, operational techniques, prospect information, marketing programs, plans, operating agreements, financial information and strategies, and computer software and other computer-related materials developed or used in its business; and (iv) any documents, materials, or items not specifically listed above, which a party designates as its proprietary information.

   1.2     "Affiliate" shall mean with respect to any person or entity, any other person or entity which directly or indirectly controls, is controlled by or is under common control with such person or entity.

   1.3     "*Average Wholesale Price" or "*AWP" shall mean and refer to the average wholesale price of a Covered Prescription Service based on the Medi-Span Prescription Pricing Guide (with Supplements) or any other nationally recognized pricing source selected by Administrator (the "Pricing Source"), as updated at least weekly and as modified in Section 4.7.2 of "Changes to *AWP/AWP", below.

   1.4     "Average Wholesale Price" or "AWP" shall mean the average wholesale price of a Covered Prescription Service based on the Pricing Source, as updated at least weekly, without any adjustments made by any entity other than the Pricing Source.

1.5 "Benefit Plan" shall mean the benefit provided to Members, including under any Medicaid, MA-PD Plan or Prescription Drug Plan. Benefit Plan coverage shall include, without limitation, any deductible or coverage gap provided for under such coverage, without regard to any subsidy by any third party of a Member's cost sharing obligations under the applicable Benefit Plan.

1.6 "Brand Name Drug" shall mean a drug marketed under a proprietary and trademark-protected name.

1.7 "Claim" shall mean a Pharmacy's billing or invoice for a single Prescription for Covered Prescription Services dispensed to a Member.

1.8 "Claims Processor" shall mean Administrator or a third party pharmacy claims processor with which Administrator may contract.

1.9 "Clean Claim" shall mean a Claim, prepared in accordance with the standard formats promulgated by the National Council for Prescription Drug Programs, electronic, batch, and on paper, which contains all of the information necessary for processing (including, without limitation, the Member identification number, the Member's name and date of birth, Prescription Drug Product NDC number, drug quantity, days supply, health care provider DEA/NPI number, NCPDP/NPI number, date of service, Submitted Cost Amount and the Usual and Customary Charge). Claims submitted in non-NCPDP standard format will not be considered a Clean Claim and will be subject to an additional Claim Processing Charge (defined in Section 4.3). A Claim shall not be considered a "Clean Claim" if at Administrator's sole reasonable discretion it determines that such Claim is (i) discrepant, false and/or fraudulent, (ii) by an individual not authorized under applicable law or regulation to write or direct the related Prescription, or (iii) with respect to any Benefit Plan that is a "Federal health care program" as defined in 42 U.S.C. 1320a-7b, relates to a Prescription written or directed by an individual who is excluded from participation in any Federal health care program pursuant to applicable federal or state law (individually and collectively, a "Non-Clean Claim"). Administrator's Non-Clean Claim determination shall be applicable regardless of whether Administrator, Client, Member, Company, and/or Pharmacy was aware of the same at the time such Prescription was processed by Pharmacy. Subject to Section 3.3.1, any, amounts paid by any Member, Administrator or Client for such Non-Clean Claim shall be subject to recoupment from Pharmacy by Administrator.

1.10 "Client" shall mean any person or entity which has entered into, or in the future enters into, a written agreement with Administrator pursuant to which Administrator provides certain consultative, administrative, and/or claims processing services in connection with the operation of one or more Benefit Plans sponsored, issued or administered by such person or entity and/or that person's or entity's customer.

1.11 "Client's Proprietary Information" shall include the Client's Benefit Plans and the information contained therein, including without limitation (i) information related to Members, employer groups, and participating providers, (ii) the financial arrangements between Clients and their Members, employer groups, and participating providers (iii) any and all symbols, logos, trademarks, trade names, and service marks developed or used in Client's business, and (iv) any documents, materials, or items not specifically listed above, which Client designates as its proprietary information.

1.12 "Cost-Sharing" or "Cost-Sharing Amounts" shall mean those coinsurance, copays, or other amounts which Pharmacy is entitled to collect from a Member for Covered Prescription Services in accordance with the terms and conditions of the Member's Benefit Plan.

1.13 "Covered Prescription Services" shall mean those Prescriptions and other pharmaceutical products, services and supplies dispensed by Pharmacy to a Member for which coverage is provided pursuant to the terms and conditions of the Benefit Plan.

1.40    "Usual and Customary Charge" shall mean the price, including all applicable customer discounts, such as special customer, senior citizen and frequent shopper discounts, that a cash paying customer pays Pharmacy for Drug Products, devices, products and/or supplies.

2.    Duties and Obligations of Administrator.

2.1    Information and Pharmacy Plan Specifications. Administrator shall provide or make available to Pharmacy (via POS System) the information Pharmacy reasonably needs to dispense Covered Prescription Services and perform its other obligations under this Agreement, including the Pharmacy Plan Specifications. Administrator may add such new information and Pharmacy Plan Specifications or amend, revise, or terminate existing information or Pharmacy Plan Specifications in its sole and absolute discretion upon ten (10) days prior written notice to Company. By way of clarification, Pharmacy Plan Specifications are information, policies and procedures for claims submission and payment, including benefit coverage information (such as Cost-Sharing Amounts, deductible limits, covered drugs, benefit exclusions, and days' supply), administrative and utilization review requirements, eligibility information and Formulary information, with other changes to this Agreement, including new or amended Benefit Plans. Administrator shall use commercial and reasonable efforts to include Company on all applicable communications and Company shall distribute to the applicable Company Participating Pharmacies.

2.2    Claims Processing. Administrator will arrange for the processing and payment of Pharmacy's claims for Covered Prescription Services dispensed to Members in accordance with Members' Benefit Plan.

2.3    Use of Third Parties. Administrator may contract with third parties for claims processing, eligibility, or other duties or obligations Administrator is required to perform under this Agreement; provided, however, Administrator shall remain ultimately liable for the negligent or intentional act or omission of such third parties in performing Administrator's duties and obligations under this Agreement, as well as the failure of any such third party to comply with Administrator's duties and obligations set forth in this Agreement.

2.4    On-Line System Maintenance. Administrator shall ensure that its Claims Processor's electronic data transmission and claims processing systems, including its POS System, are operable and available for use by Pharmacy on a continual 24 hour basis and Administrator will ensure that the response time or time associated with receipt, processing, and transmission of processed data within such system(s) will not exceed on average three (3) seconds, except for scheduled down-time, occasional, temporary disruptions or occasions when the system may stopped or slowed for necessary maintenance or repair.

2.5    Compliance with Law. Administrator represents and warrants that: (i) it is licensed to administer Prescription Drug Plans in the service areas covered by this Agreement by the applicable regulatory authority ("License"); (ii) it will not lose such License involuntarily during the course of the Agreement; (iii) it is, and will remain throughout the term of the Agreement, in compliance with all laws related to the Agreement and the services to be provided thereunder, including without limitation, any applicable prompt payment statutes and regulations or capital reserve requirements; (iv) the Agreement has been executed by its duly authorized representative; and (v) executing this Agreement and performing its obligations under this Agreement shall not cause Administrator to violate any term or covenant of any other agreement or arrangement now existing or hereinafter executed.

3.    Duties and Obligations of Company and Pharmacy and Relationship of Parties. Company agrees to and is bound by all Company obligations set forth in this Agreement, including, but not limited to the obligations set forth in this Section 3. Company, as a pharmacy services administrative organization, or PSAO, has entered into this Agreement on behalf of Pharmacy for the purpose of avoiding the necessity of Administrator to enter into separate written agreements with each Pharmacy. As such, Administrator acknowledges and agrees that: (A) Any reference in the Agreement to the practice of pharmacy, or the services or products to be provided by a licensed pharmacy, or to any warranties or representations

regarding licensure, compliance with laws, rules or regulations, indemnification and defense obligations, or the right to practice in a given location, shall solely apply to Pharmacy and not to Company. (B) the sole duty and obligation of Company is to contract Pharmacies and administer this Agreement and require compliance by such Pharmacies (C) all the obligations and duties shall be the responsibility of the respective Pharmacy unless specified in the Agreement. Company represents and warrants that it has the authority to enter into this Agreement as the contracting agent for and on behalf of each Pharmacy identified on Exhibit A. Company further represents and warrants that each Pharmacy identified on Exhibit A has agreed to be bound by and comply with all of the terms and conditions of this Agreement.

3.1     Scope of Obligations. Company represents and warrants to Administrator that it has the legal authority to bind each Pharmacy identified on Exhibit A, which Pharmacy will, either directly or indirectly, whether through one or more Affiliates or otherwise, provide Covered Prescription Services to Members. Company represents, warrants, and covenants that all of the obligations of Pharmacy hereunder shall also be the obligations of all Pharmacy locations. Each Pharmacy location in the Company network that, either directly or indirectly, whether through one or more Affiliates or otherwise, provides Covered Prescription Services to Members, shall comply with all of the requirements of this Agreement addenda, exhibits, Pharmacy Manual and with all applicable laws and regulations relevant to performance under this Agreement and with Company's and Pharmacies' operations in general. Company shall require such compliance by each Pharmacy location and, upon obtaining knowledge a Pharmacy is non-compliant, shall terminate from Exhibit A any such non-compliant Pharmacy.

3.2     Participation in Client's Benefit Plan Network. By Company executing this Agreement on behalf of Pharmacy, Pharmacy is agreeing to participate in the network for Benefit Plans offered or administered by Clients. Pharmacy will provide Covered Prescription Services to Members in a safe, diligent and professional manner, in accordance with applicable laws and regulations, this Agreement and, subject to Sections 2.1 and 11.1, respectively, Pharmacy Plan Specifications and Pharmacy Manual.

3.3     Dispense Covered Prescription Services.

3.3.1   Member's Eligibility Status. Prior to dispensing Covered Prescription Services, Pharmacy shall verify whether the individual receiving such Covered Prescription Services is an eligible Member. Such verifications shall be performed by Pharmacy using the POS System or such other process as identified by Administrator. If Pharmacy is unable to confirm a Member's eligibility, then Pharmacy shall call Administrator's Pharmacy Help Desk or equivalent pharmacy service department. In the event that Pharmacy fails to verify Member eligibility, neither Administrator nor Client shall have any obligation to compensate Pharmacy for any Covered Prescription Services dispensed to persons who are not eligible Members at the time such drugs are dispensed. Clean Claims that are approved via the POS System may not be retrospectively denied for eligibility except in the case of audit, fraud, or as required by law, regulation, or a government program.

3.3.2   Formulary and Generic Drug. In the provision of Covered Prescription Services, Pharmacy and each Pharmacy location shall use its best efforts, in accordance with all applicable state and federal law, to adhere to and promote the Formulary, except to the extent Pharmacy is: (i) prohibited by state law, or (ii) otherwise directed by Administrator through the POS System. If (i) neither the Prescription nor applicable state or federal law prohibit substitution of a generic drug equivalent for the Drug Product, and (ii) Pharmacy or the Pharmacy location obtains consent from the Member and the Member's physician, when and if required by applicable state or federal law, then Pharmacy shall dispense a generic drug equivalent for the Drug Product to the Member.

3.3.3   Cost-Sharing Amounts. Claims Processor shall communicate to Pharmacy (via the POS System) the Cost-Sharing Amounts applicable to Covered Prescription Services.

Unless otherwise required under this Agreement, Pharmacy shall collect the full Cost-Sharing Amounts (if any) that are applicable to Covered Prescription Services being dispensed to Members. Pharmacy agrees that it shall not at any time seek reimbursement for Cost-Sharing Amounts from Administrator or any Client. This Section 3.3.3 shall survive expiration or termination of the Agreement. In the event that the Cost-Sharing Amount is greater than the Prescription Drug Compensation, the Client's liability for such Claim shall be $0.00. Notwithstanding the foregoing, Pharmacy (A) may bill or charge individuals who were not Members at the time that services were rendered and (B) may bill or charge a Member in the following circumstances: (i) for applicable Cost-Sharing Amounts, Member discount card payments, Member payments and/or deductibles not collected at the time that Covered Prescription Services are rendered; (ii) if a Client or Administrator become Insolvent (defined in Section 5.2.6) or otherwise fails to pay Pharmacy in accordance with applicable Federal law or regulation (e.g., ERISA) provided that Pharmacy has first exhausted all reasonable efforts to obtain payment from Client and Administrator, however, this shall not apply to Medicaid Members; and (iii) for services that are not Covered Prescription Service only if: (x) the Member's plan provides, or Administrator confirms that, such specific services are not covered; (y) the Member was advised in writing prior to the services being rendered that the specific services are not covered services; and (z) the Member agreed in writing to pay for such services after being so advised.

3.4     Specific Pharmacy Requirements.

3.4.1   Eligibility. Unless approved by Administrator in advance, in order to be eligible to participate as a Pharmacy in Administrator's network, Pharmacy shall not have previously been suspended, terminated or excluded from Administrator's network in the past five (5) years for failing to adhere to the terms of this Agreement or any prior or subsequent agreements with Administrator or Administrator's successor. Administrator will promptly notify Company upon making such determination and, if such Pharmacy was previously approved; terminate or exclude such Pharmacy pursuant to Sections 3.4.4 or 5.2.4. If any Pharmacy location has been suspended, terminated or excluded from Administrator's network in the past five (5) years, such Pharmacy location shall not be eligible to provide services under this Agreement, unless otherwise permitted by Administrator in its sole and absolute discretion.

3.4.2   Pharmacies. Unless otherwise provided herein, Company shall provide Administrator with the credentialing information required on the Affiliation Credentialing Application attached hereto for each Pharmacy listed on Exhibit A to this Agreement. Company shall promptly notify Administrator in writing upon knowledge of any changes (except for additions or deletions of Pharmacies, as noted below in Section 3.4.3) to the credentialing information. Company shall require that Pharmacies shall promptly notify Company in writing of any material changes.

3.4.3   Additions or Deletions of Pharmacies. Company shall provide Administrator with at least fifteen (15) days written notice prior to adding a new Pharmacy location for use in providing Covered Prescription Services to Members, which new Pharmacy location shall satisfy and comply with all terms and conditions of this Agreement and subject to Administrator's approval which shall not unreasonably be withheld. In the event Pharmacy acquires or is acquired by, merges with, or otherwise becomes affiliated with another provider of pharmacy services that is already under contract with Administrator to participate in Administrator's pharmacy network, this Agreement and the other agreement will each remain in effect and will continue to apply as they did prior to the acquisition, merger, or affiliation, unless otherwise agreed to in writing by all Parties to such agreements. Company shall promptly notify Administrator upon knowledge of any actual or pending termination or suspension in the operation of any Pharmacy location identified in Exhibit A.

and be deemed incorporated herein, irrespective of whether or not such laws and regulations are expressly provided for in this Agreement.

3.13.5 Reports. Company and Pharmacy shall provide Administrator with any report(s), data or other information which Administrator may reasonably request in a format, via a medium, and at a frequency reasonably determined by Administrator or Administrator's Clients or as otherwise required by applicable laws and regulations. Company and Pharmacy shall each be responsible for the integrity and accuracy of all of its own data furnished or transmitted to Administrator or Claims Processor, and shall correct all errors in such data within ten (10) business days of being made aware thereof. To the extent such reports, data or other information is required for compliance with applicable laws and regulations, including but not limited to Medicare Laws and Regulations, Company and Pharmacy shall certify as to the accuracy and validity of its own report, data or other information prior to submission to Administrator. If Company or Pharmacy, as applicable, fails to timely comply with providing Administrator with any requested reports, data or other information required by applicable laws or by any Government Authority, Company or Pharmacy, as applicable, shall reimburse Administrator for any penalty, fine, etc. incurred by Administrator or Administrator's Clients as a result of not complying with this Section 3.13.5.

3.14. Use of Third Parties. Company or Pharmacy may contract with third parties for duties or obligations Company or Pharmacy is required to perform under this Agreement; provided, however, Company or Pharmacy, as applicable, shall remain ultimately liable for the negligent or intentional act or omission of such third parties in performing Company or Pharmacy's duties and obligations under this Agreement, as well as the failure of any such third party to comply with Company or Pharmacy's duties and obligations set forth in this Agreement.

3.15. Compliance with Pharmacy Manual. Company and Pharmacy shall comply with the Pharmacy Manual. Subject to Section 1.31, any of the rules, policies, administrative procedures and guidelines adopted by Administrator may be distributed in the form of a Pharmacy Manual or in other communications, including, but not limited to a website identified by Administrator. The Pharmacy Manual may change from time to time by providing advance written notice to Company. Any such changes shall be binding on Company and Pharmacy.

3.16 Cooperation of Company. To the extent anything in this Agreement (including but not limited to any exhibits, addenda or attachments hereto) places any obligations on Pharmacy, Company shall not interfere with, delay, condition or obstruct in any manner the fulfillment by Pharmacy of such obligations.

4. Compensation.

4.1 Prescription Drug Compensation Amounts. Administrator acting on behalf of such Clients, will process the Prescription Drug Compensation owed to Pharmacy for each Covered Prescription Service dispensed to Members based on the rates and under the terms and conditions for Prescription Drug Compensation in Compensation Exhibits attached hereto. Administrator acknowledges and agrees that, unless set forth in a separate Compensation Exhibit to the Agreement signed by Company and Administrator, this Agreement shall in no way be construed or interpreted to require a Pharmacy to participate in any consumer discount card, government sponsored or endorsed prescription discount card, or 100% Cost-Sharing .

4.1.1 ███████████████████████████████████

4.1.2 Central Payment. ████████████████████████



4.1.3    Client Non-Payment.

4.2    Claims Submission.

4.2.1    Covered Prescription Services.

4.2.2    Claims Submission.  In order to receive payment, each Pharmacy must submit a Clean Claim to Claims Processor for each Covered Prescription Service dispensed via the POS system or as otherwise agreed. Pharmacy is responsible for the payment of any and all its own transaction charges or fees associated with the transmission of Claims or claim information to Administrator, including Claims Processor Charges as defined in Section 4.3.  A Clean Claim must be submitted to Claims Processor within thirty (30) days after the date of service (or any longer period required by law).  Administrator shall provide Pharmacy with an opportunity to correct erroneous, defective or inaccurate Claims submitted by Pharmacy within the Client's claim submission time period established by the Benefit Plan. If any Claim is rejected or if additional information is required for further processing by Administrator or its Claims Processor, Pharmacy must resubmit the Claim within sixty (60) days of Pharmacy's receipt of such rejected Claim provided that the resubmitted Claim may only be processed and paid if it is a Clean Claim and subject to receipt of payment from the applicable Client.  Additionally Pharmacy will reverse claims for all or a portion of Covered Prescription Services not provided to Members within fifteen (15) days of the date of service. Unless otherwise agreed to in writing by the Administrator, Claims submitted after the time periods set forth in this Section 4.2.2 may not be eligible for payment.

4.2.3    Prohibition on Repackaging and Reimportation.

4.3    Claims Processor Charges.

9.2 Access to Records and Audits. During the term of the Agreement and for a period of five (5) years thereafter, Administrator , or its designee, shall have the right, upon reasonable notice and at reasonable times, to access, inspect, review, Audit (including on-site and desktop Audits) and make copies of the Records ("Audit"). In addition to the foregoing, Company and Pharmacy shall honor and accommodate all Audit requests by Government Authority ("Governmental Audit"). Company and/or Pharmacy, as applicable, shall pay its costs incurred in connection with its provision of information for purposes of a Governmental Audit.

9.3 Payment for Audit. Administrator shall pay for prescription reproduction/copying and applicable travel costs associated with an Administrator Audit or Client or an external auditor who is conducting the Audit on Administrator's or Client's behalf. In the event that an Audit discovers any error by Company or Pharmacies or discrepancy in the amount to be charged or paid to Administrator, Pharmacy shall reimburse Administrator, the full amount of any amounts charged to Administrator in error. Administrator shall reimburse Pharmacy the full amount of any amounts incurred and paid by Pharmacy to Administrator in error, as applicable. Administrator shall not recoup money from Pharmacy based upon extrapolated claim review, unless required by law or governmental authority. This Section 9 shall survive expiration or termination of the Agreement and if Company or Pharmacies cease conducting business.

9.4 Audit Recovery Offsets. At Administrator's option, Administrator may obtain reimbursement for overpayments, made to a particular Pharmacy discovered as a result of an audit conducted in accordance with Section 9 of this Agreement, made to Pharmacy either by: (i) recouping such amounts against future payments due from Administrator to Company's Central Payment – (ii) recouping such amounts against future payments due from Administrator to Pharmacy or (iii) by requiring reimbursement of such overpayments from applicable Pharmacy(s), which Pharmacy will pay to Administrator within thirty (30) days of notice thereof. Notwithstanding anything to the contrary contained in this Agreement, any Administrator offset in accordance with this Section 9.4 of fifty thousand dollars ($50,000.00) or more per Pharmacy, shall not be reversed or recouped from Company's Central Payment, but instead shall result in the offending Pharmacy being de-linked by Administrator from Central Payment, and later re-linked once payment terms have been reestablished. Administrator shall not reverse or recoup from Company's Central Payment any Pharmacy closed or terminated and removed from Exhibit A and shall repay to Company's Central Payment any amounts previously offset from Pharmacy after such Pharmacy has been removed from Exhibit A.

10. Dispute Resolution.

10.1 Other than with respect to issues giving rise to immediate termination under Section 5.2.3 hereof or non-renewal under Section 5 hereof, the parties will work in good faith to resolve any and all issues and/or disputes between them (hereinafter referred to as a "Dispute").

10.2 In the event a Dispute arises, the party asserting the Dispute shall provide written notice to the other party identifying the nature and scope of the Dispute to the other party sufficient for a reasonable person to be apprised thereof. If the parties are unable to resolve the Dispute within thirty days after such notice is provided, then either party may request in writing a meeting or telephone conference to resolve the Dispute. At any such meeting or telephone conference, each party shall have present an officer or senior official of its company. If the parties are still unable to resolve the Dispute following this meeting, either party may request that the parties attempt to resolve the dispute through mediation by providing written notice to the other party. The parties will then select a mutually agreeable mediator to aid them in resolving the Dispute. If the parties cannot agree on a mediator, either party may request that the American Arbitration Association ("AAA") designate one. Any mediator must be acceptable to each party. Mediation will be conducted as specified by the mediator after input from the parties. The parties agree to cooperate with the mediator and the mediation process in a good faith attempt to resolve the Dispute. Any mediation between the parties will be deemed to be confidential as settlement discussions. The mediator may not testify for either party in any later proceeding relating to the Dispute. No recording or other transcript may be made of the mediation proceedings. Each

party will bear its own expenses and fees, and expenses of the mediator will be shared equally between the parties.

10.3    This Article 10 shall survive any termination of this Agreement.

11.    

<u>General Terms.</u>

11.1    <u>Entire Agreement</u>.    This Agreement (including the Pharmacy Manual, Pharmacy Plan Specifications, the Commercial Addendum, the Medicaid Addendum, the Medicare Part D Addendum, Compensation Exhibits, and all other addenda, exhibits and schedules attached hereto) constitutes the final entire agreement between the parties with respect to the subject matter hereof and supersedes all prior or contemporaneous oral or written agreements, representations or understandings between the parties with respect to the subject matter hereof. The Pharmacy Manual and all such addenda, exhibits and schedules, as the same may be amended from time to time in accordance with the terms of this Agreement, are incorporated herein by reference and made a part hereof; provided, however, if there is any conflict between the terms of this Agreement and the Pharmacy Manual, the terms and conditions of this Agreement shall control except to the extent otherwise required by law.

11.2    <u>Amendment</u>.    Except as otherwise provided elsewhere in the Agreement, this Agreement (including the addenda, exhibits and schedules attached hereto) may only be amended as follows:

(a)  Administrator may unilaterally amend this Agreement by providing thirty (30) days prior written notice to Company in order to comply with changes in applicable law and/or regulatory requirements, which shall become effective at the end of the thirty (30) day notice period or a shorter notice period if necessary to comply with changes in applicable law and/or regulation.

(b)  Administrator may also amend this Agreement by providing thirty (30) days prior written notice to Company.  Company will be allowed thirty (30) days to review proposed change and will provide written documentation agreeing or disagreeing to such change within such thirty (30) days. If Company does not respond to such amendment in writing within such thirty (30) days, then Company and Pharmacy shall be deemed to have accepted the proposed amendment effective as of the effective date of Administrator's written notice. In the event Company objects within the thirty (30) day notice period by providing written notice to Administrator, the parties shall confer and use good faith best efforts to reach agreement. If such agreement cannot be reached, either party may terminate in accordance with Section 5.2.1.

(c)  This Agreement also may be amended or modified pursuant to a dated written instrument executed by Administrator and Company.

11.3    <u>Waivers</u>.  The failure of any party to insist in any one or more instances upon performance of any terms or conditions of this Agreement shall not be construed as a waiver of future performance of any such term, covenant or condition, and the obligations of such party with respect thereto shall continue in full force and effect.

11.4    <u>Notices</u>.  All notices, requests, consents, demands and other communications hereunder (collectively, "Notices") shall be in writing, addressed to the receiving party's address(or, at Administrator's sole option and solely for Notices sent by Administrator, Company's facsimile number or email address) as set forth below or to such other address (or, at Administrator's sole option and solely for Notices sent by Administrator, Company's facsimile number or email address) as a party may designate by providing notice pursuant to this section, and either (i) delivered by hand, (ii) sent by a nationally recognized overnight courier, (iii) sent by registered or certified mail, return receipt requested, postage prepaid, (iv) solely with respect to Notices sent by Administrator, sent by facsimile transmission or (v) solely with respect to Notices sent by Administrator, sent by email:

11.7    Professional Pharmacy Judgment.  It is understood and agreed that the operation and maintenance of the Pharmacies and their respective facilities, equipment and the provision of all Covered Prescription Services shall be solely and exclusively under the control and supervision of the Pharmacy.  All decisions respecting the provision of Covered Prescription Services are rendered solely by a Pharmacy and their respective duly authorized personnel, and not by Company, Administrator or any Client. Pharmacy is solely responsible for all Covered Prescription Services provided to Members by the Pharmacies. It is expressly understood that the relationship between a Member and a Pharmacy shall be subject to the rules, limitations, and privileges incident to the pharmacist-patient relationship.

11.8    Utilization of Pharmacies.  Nothing in this Agreement shall be construed to require Administrator or any Client to assign or refer any minimum or maximum number of Members to a Pharmacy.

11.9    Force Majeure.  In the event that any party is prevented from performing or is unable to perform any of its obligations under this Agreement due to any act of God, fire, casualty, flood, earthquake, war, strike, lockout, epidemic, destruction of production facilities, riot, insurrection, material unavailability, or any other cause beyond the reasonable control of, but not the fault of the party invoking this section, and if such party has been unable to avoid or overcome its effects through the exercise of commercially reasonable efforts, such party shall give prompt written notice to the other party, its performance shall be excused, and the time for the performance shall be extended for the period of delay or inability to perform due to such occurrences.  This Section 11.9 shall not apply to a party's obligation to pay any amounts owing to another party and lack of funds or inability to pay will not be deemed as beyond a party's reasonable control or otherwise constitute a force majeure event under this Section 11.9.

11.10    Binding Effect; Third Party Beneficiaries.  The statements, representations, warranties, covenants and agreements in this Agreement shall be binding on the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Administrator consents to Company's delegating part or all of its obligations to any affiliate and to assigning or granting a security interest in this Agreement in connection with any financing or securitization by Company or any Affiliate. Nothing in this Agreement shall be construed to create any rights or obligations except among the parties hereto; no person or entity shall be regarded as a third party beneficiary of this Agreement.

11.11    Governing Law.  This Agreement and the rights and obligations of the parties hereunder shall be governed by and construed in accordance with the laws of California, without giving effect to the conflict of law principles thereof.

11.12    Severable Provisions; Headings.  The provisions of this Agreement are severable.  The invalidity or unenforceability of any term or provision in any jurisdiction shall be construed and enforced as if it has been narrowly drawn so as not to be invalid, illegal, or unenforceable to the extent possible and shall in no way affect the validity or enforceability of any other terms or provisions in that jurisdiction, or of this entire Agreement in that jurisdiction.  The headings of paragraphs in this Agreement are for convenience and reference only and are not intended to, and shall not define or limit the scope of the provisions to which they relate.  Any provision shall survive this Agreement if its context shows the parties intended it to survive.

11.13    340(B) Certification.  If Company is or becomes aware that any Pharmacy listed on Exhibit A during the term or any renewal term of this Agreement, is or becomes eligible to distribute Drug Products under the Public Health Service Act, Section 340(B) program as a "Covered Entity" or contracted with a Covered Entity as defined by the law, Company shall promptly provide Administrator with written notice of such eligibility upon request.

11.14    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

☒ Commercial Addendum
☒ Medicaid Addendum
☒ Medicare Part D Addendum

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their authorized representatives as of the executed dates written below

AmerisourceBergen Drug Corporation dba
Good Neighbor Pharmacy Provider Network,
as authorized agent for and on behalf of
participating pharmacies which are members of
GNPPN's network of pharmacies

Chain Code or NCPDP/NPI # 904, 638

By _____
    (signature)

Name  Peter J. Kounelis
        (print name)
      Sr. Director, Provider Network
Title  Business Development

Date  August 22, 2014

OptumRx, INC.

By  _Carrie Tichey_
    Carrie Tichey (Dec 9, 2014)
    (signature)

Name: Carrie Tichey

Title: SVP, Network Relations

Execution Date  Dec 9, 2014

Effective Date  Dec 9, 2014